IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF OREGON
EUGENE DIVISION

| | |
|---|---|
| AMERICAN HALLMARK INSURANCE COMPANY OF TEXAS,<br><br>　　　　Plaintiff,<br><br>　v.<br><br>ENCADRIA STAFFING SOLUTIONS LLC<br><br>　　　Defendant/Third-Party Plaintiff,<br><br>　v.<br><br>GEORGIA PACIFIC CHEMICALS, LLC<br><br>　　　Third-Party Defendant/Fourth-Party Plaintiff<br><br>　v.<br><br>OREGON POWDER COATING & AUTOMOTIVE SPECIALTIES, LLC<br><br>　　　Fourth-Party Defendant. | Civ. No. 6:19-cv-00854-AA<br><br>**OPINION AND ORDER** |

AIKEN, DISTRICT JUDGE:

This case involves an oven fire at an industrial powder coating facility in Tangent, Oregon, where resin material burst into flames during the curing process. Plaintiff, American Hallmark Insurance Company of Texas ("Hallmark") seeks to recover from Defendant Encadria Staffing Solutions LLC ("Encadria") the amount it paid its insured, Oregon Powder Coating and Automotive Specialties, LLC ("OPC").

Page 1 – OPINION AND ORDER

Hallmark alleges that Encadria's employee negligently operated the oven, causing the fire. Encadria filed a Third-Party Complaint against Georgia Pacific Chemicals LLC ("Georgia Pacific"), alleging that Georgia Pacific was liable to Encadria for indemnification. ECF No. 11. Georgia Pacific then filed a Fourth-Party Complaint against OPC, ECF No. 26, alleging contractual indemnity and contribution. This case comes before the Court on Georgia Pacific's Motion for Partial Summary Judgment against OPC, ECF No. 38, and OPC's Motion for Summary Judgment against Georgia Pacific, ECF No. 42. For the reasons explained, the Court DENIES Georgia Pacific's Motion for Partial Summary Judgment, ECF No. 38, and GRANTS OPC's Motion for Summary Judgment. ECF No. 42.

## BACKGROUND

**I.**     ***Factual Background and Procedural History***

Hallmark provides insurance coverage to OPC, which operates an industrial powder coating and sandblasting facility which includes ovens used to cure resin. ECF No. 1 at 1, 3. The policy issued by Hallmark insured OPC's facility and the industrial oven at issue. *Id*. Separately, OPC developed a business relationship with Georgia Pacific, whereby Georgia Pacific's employees used OPC's ovens to cure resin for Georgia Pacific. *Id*. Occasionally, Georgia Pacific contracted with a staffing company, Encadria, to supply workers to operate the ovens at OPC.

On November 30, 2017, an Encadria employee named Tyler Mann ("Mann") was supervising the oven on behalf of Georgia Pacific. ECF No. 1 at 4. That day, a fire started inside the oven Mann was using. Hallmark alleges that the fire began

because Mann failed to follow the oven protocol and did not properly set the temperature for the oven. The temperature in the oven rose to 500 degrees Fahrenheit, a temperature "excessively higher than standard temperature[ ] for resin curing[.]" *Id*. at 4. Mann summoned Robert Tatum ("Tatum"), an OPC employee, for assistance. ECF No. 26 at 10. Tatum opened the door of the oven. ECF No. 26 at 10. The resin inside the oven ignited. ECF No. 1 at 4. The fire caused "significant damage" to OPC's property and resulted in substantial loss of business income. *Id*. at 5.

OPC made an insurance claim under its policy with Hallmark, seeking to recover for damage to its real and personal property, lost business income, and other losses. *Id*. at 5. Pursuant to the policy, Hallmark paid approximately $150,000 to OPC. *Id*. at 5.

Hallmark seeks to recover from Encadria for any claim OPC may have against Encadria, up to the amount Hallmark paid to OPC. This is not Hallmark's first subrogation action based on the fire incident. Hallmark first filed a lawsuit against Georgia Pacific and Encadria, but the parties stipulated to dismissal of Georgia Pacific. *American Hallmark Ins. Co. v. Georgia-Pacific Chemicals LLC, et. al.* 6:18-cv-01457-MK. Now, Hallmark alleges its right to recover from Encadria alone based on Encadria's alleged negligence. *Id*. at 5-6.

Specifically, Hallmark alleges that the fire, and its resulting damage, arose directly and proximately from the "negligence, carelessness, and/or negligent omissions" of Encadria. *Id*. at 6. Hallmark asserts that Encadria failed to properly

Page 3 – OPINION AND ORDER

train and supervise its workers; failed to hire qualified workers; failed to recognize the risk its employees posed; failed to investigate the employee who caused the fire; and failed to exercise due care under the circumstances. *Id*.

After Encadria filed its Answer, ECF No. 10, Encadria initiated a Third-Party Complaint, ECF No. 11, against Georgia Pacific, asserting that Georgia Pacific was "responsible for training, supervising, and directing Encadria's employees in the performance of their duties" at OPC, including Mann. ECF No. 11 at 3. Encadria claims that Georgia Pacific is "liable to Encadria for common-law indemnification[,]" and that any obligation of Encadria to Hallmark should be "discharged" by Georgia Pacific. ECF No. 11 at 4.

## II.  *Dispute Between Georgia Pacific and OPC*

Georgia Pacific, in turn, filed a Third-Party Complaint against OPC, which it later amended, alleging breach of contract for failure to defend and indemnify (Claim I); failure to add Georgia Pacific as an additional insured under its policy with Hallmark (Claim II); and failure to prevent Hallmark's subrogation actions wherein Georgia Pacific is a named party (Claim III). ECF No. 26 at 7-9. Georgia Pacific also seeks declaratory judgment that OPC breached its contract to defend and indemnify (Claim IV); alleges that OPC was negligent with respect to the oven fire (Claim V); and argues that OPC is liable to Georgia Pacific for common law indemnity (Claim VI) and contribution (Claim VII). *Id*. at 9-13.

Concerning its claim for negligence, Georgia Pacific alleges that OPC's employee, Tatum, was not properly trained and that OPC's oven was not properly

Page 4 – OPINION AND ORDER

maintained. *Id*. at 10. Georgia Pacific claims as its damages the cost to defend and bring claims and the damage to its resin product, which rendered it "unsellable." *Id*.

As to its breach of contract claims, Georgia Pacific alleges that it operated OPC's industrial ovens pursuant to a "blanket" Purchase Order P562170052 ("PO"). *Id*. at 4. The PO provided that OPC's "purchase[] of goods and/or services" is "subject to the [Georgia Pacific] Terms and Conditions." *Id*. at 4. Georgia Pacific alleges that OPC breached those "Terms and Conditions" when it failed to defend, indemnify, and hold harmless Georgia Pacific for any claims arising out of the fire. *Id*. at 8-9.

In response, OPC denied most of the allegations and contends that, although OPC received purchase orders from Georgia Pacific for billing purposes, the operation of the oven was not pursuant to terms of any purchase order. OPC also raised several affirmative defenses, including that Georgia Pacific's claims against OPC were barred by the antisubrogation rule. ECF No. 27 at 12.

Georgia Pacific argues that it is entitled to partial summary judgment against OPC, maintaining that the PO it issued governed the parties' contractual relationship; that the PO incorporated "Terms and Conditions" listed on Georgia Pacific's website; and that OPC breached those Terms and Conditions. ECF No. 38 at 7.

According to Georgia Pacific, at the very least the agreement between the parties included the following terms: "[Georgia Pacific would] pay [OPC] an hourly rate for operation of the oven of $50 per hour and for forklift assistance at the rate of $35 per hour, and for monies due to be paid by [Georgia Pacific] to [OPC]." Cramer

Page 5 – OPINION AND ORDER

Decl. Ex. 6 (Resp. No. 3). However, in June, 2012, Holly Westbrook, the office manager for OPC, emailed Georgia Pacific asking for a purchase order "so that Oregon Powder could bill" Georgia Pacific. ECF No. 38 at 7. Between 2012 and the fire in November of 2017, Georgia Pacific issued seven purchase orders to OPC, which it used for "blanket" billing purposes. ECF No. 37, Exs. C-I. The PO contained the following language:

> Unless expressly subject to a written agreement signed by both Buyer and Supplier, Supplier acknowledges that it has reviewed Buyer's "Terms and Conditions of Purchase", available at Buyer's website (http://www.apps.gp.com/GP_Terms_Conditions_Purchase.pdf) (the"GP Terms and Conditions") and that ***purchases of goods and/or services by GP are subject to the GP Terms and Conditions. Buyer reserves the right to modify the GP Terms and Conditions at any time without prior notice*** and the current version shall supersede all prior versions upon posting to Buyer's website.

ECF No. 37, Exs. F-I (emphasis added).

The Terms and Conditions[1] listed on the website required one in OPC's position to "defend and hold harmless" Georgia Pacific; "list [Georgia Pacific] as an additional insured. . . and provide [Georgia Pacific] with a certificate of insurance and additional insured endorsement," and "waive all rights of subrogation that the insurers may have against [Georgia Pacific.]" Bass Decl. Ex. 1. Georgia Pacific states that between 2012 and 2017, OPC never took any of the actions listed in the Terms and Conditions. ECF No. 38 at 15; Bass Dep. 76:12-22. However, Georgia Pacific

---

[1] OPC objects to the admissibility of the Terms and Conditions arguing that it was not properly authenticated. The Court disagrees and finds the testimonial evidence Georgia Pacific submits is sufficient proof of authenticity under Federal Rule of Evidence 901.

contends that, based on the "objective theory of contracts," OPC accepted the Terms and Conditions when it submitted 41 invoices to Georgia Pacific each referencing the PO.

OPC contends that it is entitled to summary judgment on all Georgia Pacific's claims. OPC asserts that Georgia Pacific "inappropriately seeks to hold [OPC] liable to its own insurer for the damages, and accordingly, the anti-subrogation rule applies to prohibit [Georgia Pacific's] fourth-party claims [against OPC]." As another premise for summary judgment, OPC contends that it never assented to Georgia-Pacific's "Terms and Conditions" and that, as a matter of law, Georgia Pacific cannot prove as much.

OPC maintains that Georgia Pacific used the oven for 65 hours before a purchase order was issued. ECF No. 42 at 11. OPC states that the purpose of the PO was to facilitate billing, not enter into an agreement concerning insurance terms. *Id*. Among other evidence, OPC submits email communications between Westbrook of OPC and Debra Bass ("Bass") of Georgia Pacific, which began when Westbrook determined she needed to bill Georgia Pacific for oven usage that had already occurred. Westbrook Decl. ¶ 7, 9, Ex. 101. Bass responded: "I will have a PO to you by Friday to reference on the invoice and instructions on where to send the invoice." *Id*. at 7, Ex. 101. Later, Westbrook sent Bass the following email:

> Good morning Debra, I have more hours I need to bill GP for.
>
> * * *
>
> If you could please send a purchase order at your convenience. Also, I was wondering if maybe in the future when it's more constant, we might

Page 7 – OPINION AND ORDER

be able to set up a blanket p.a. or something so I don't have to request a PO every time I need to bill your company?

*Id*.

Thereafter, Georgia Pacific sent "blanket" purchase orders to Westbrook, who used the PO number as a reference for invoicing. At no time did OPC sign the signature line in the PO.

Finally, OPC maintains that it is entitled to summary judgment on Georgia Pacific's claim for negligence (Claim V) because, to the extent that Georgia Pacific alleges that OPC's negligence entitles Georgia Pacific to common law indemnity and contribution from OPC as it relates to Hallmark's sought relief, such claims are barred by the antisubrogation rule.

## SUMMARY JUDGMENT STANDARD

Rule 56(a) of the Federal Rules of Civil Procedure states that a party is entitled to summary judgment if the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party has the burden of establishing the lack of a genuine dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The court must view the evidence in the light most favorable to the non-movant and draw all reasonable inferences in the non-movant's favor. *Clicks Billiards Inc. v. Sixshooters Inc.*, 251 F.3d 1252, 1257 (9th Cir. 2001). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge," however, when "ruling on a motion for summary judgment," the "mere existence of a scintilla of evidence in support of the plaintiff's

position [is] insufficient...." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252, 255 (1986). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citation and quotation marks omitted). Rule 56 allows a court to grant summary adjudication, also known as partial summary judgment, when there is no genuine issue of material fact as to a claim or portion of that claim. *See* Fed. R. Civ. P. 56(a); *Lies v. Farrell Lines, Inc.*, 641 F.2d 765, 769 n.3 (9th Cir. 1981) ("Rule 56 authorizes a summary adjudication that will often fall short of a final determination, even of a single claim ....") (internal quotation marks and citation omitted). The standards that apply on a motion for summary judgment and a motion for summary adjudication are the same. *See* Fed. R. Civ. P. 56(a), (c); *Mora v. Chem-Tronics*, 16 F. Supp. 2d 1192, 1200 (S.D. Cal. 1998).

Each party's position must be supported by (1) citing to particular portions of materials in the record, including, but not limited to, depositions, documents, declarations, or discovery; or (2) showing that the materials cited do not establish the presence or absence of a genuine dispute or that the opposing party cannot produce admissible evidence to support the fact. *See* Fed. R. Civ. P. 56(c)(1) (quotation marks omitted). The court may consider other materials in the record not cited to by the parties, but it is not required to do so. *See* Fed. R. Civ. P. 56(c)(3); *Carmen v. San Francisco Unified Sch. Dist.*, 237 F.3d 1026, 1031 (9th Cir. 2001).

## DISCUSSION

The Court first addresses whether the PO constituted a contract between OPC

and Georgia Pacific before considering whether principles of antisubrogation prevent Georgia Pacific from recovering on its claims against OPC.

## I. Contract Formation[2]

Oregon subscribes to the objective theory of contracts. *Kabil Devs. Corp. v. Mignot*, 279 Or. 151, 155–57, 566 P.2d 505, 507–8 (1977) ("objective" theory of contracts operates in Oregon); *Wieck v. Hostetter*, 274 Or.App. 457, 471, 362 P.3d 254, 262 (2015) ("In assessing whether a contract was formed, Oregon applies an objective theory of contracts."). Under this approach, in "determining whether a contract exists and what its terms are, we examine the parties' objective manifestations of intent, as evidenced by their communications and acts." *Ken Hood Constr. Co. v. Pac. Coast Constr., Inc.*, 201 Or. App. 568, 578 (2005*), modified on reconsideration*, 203 Or. App. 768 (2006); *see also Wooton v. Viking Distr. Co., Inc.*, 136 Or. App. 56, 59 (1995) (holding "we examine the parties' objective manifestations of intent, measured by whether a reasonable person would construe a promise from the words and acts of the other."). Formation of a contract requires "'a bargain in which there is a manifestation of mutual assent to the exchange and a consideration.'" *Id.* (quoting Restatement (Second) of Contracts § 17(1) (1981)). "'The manifestation of mutual assent to an exchange ordinarily takes the form of an offer or proposal by one party

---

[2] The Court has diversity jurisdiction over this action under 28 U.S.C. § 1332, as the parties are citizens of different states and the amount in controversy exceeds $75,000. In a diversity action, a federal court applies state substantive law in accordance with the choice-of-law provisions of the forum state. *See Erie R.R. v. Tompkins*, 304 U.S. 64 (1938).

followed by an acceptance by the other party or parties.'" *Id.* (quoting *id.* at § 22(1)).

In the objective theory, the manifestation of acceptance made to an offeror results in a contract, regardless of the intent of the party that manifests acceptance. *The Erection Co. v. W & W Steel, LLC*, No. CV 11-805-JE, 2011 WL 5008325, at *8 (D. Or. Oct. 20, 2011) (citing *Ken Hood Constr.*, 201 Or.App. at 578), *aff'd*, 513 F. App'x 664 (9th Cir. 2013). Contract law is "not concerned with the parties' undisclosed intents and ideas"; instead, only the parties' "communications and overt acts" are relevant. *Kitzke v. Turnidge*, 209 Or. 563, 573 (1957); *see also DCIPA, LLC v. Lucile Slater Packard Children's Hosp. at Stanford*, 868 F.Supp.2d 1042, 1053 (D. Or. 2011) (finding "whether the parties entered into a contract does not depend on their uncommunicated subjective understanding; rather it depends on whether the parties manifest assent to the same express terms") (internal quotation marks omitted).

Mutual assent can be inferred from the parties' conduct. *Bennett v. Farmers Ins. Co. of Or.*, 332 Or. 138, 153 (2001) (law requires evidence of "mutual assent" whether "expressed through an offer and acceptance" or "manifested by conduct"); *see also The Erection Co.*, 2011 WL 5008325, at *8 ("'Mutual assent may be inferred from the conduct of the parties'") (quoting *Ken Hood Constr.*, 201 Or. App. at 579). Whether a particular statement or act is a manifestation of assent is a question of fact. *Bennett*, 332 Or. at 148, 26 P.3d at 792.

Finally, for "an agreement to constitute an enforceable contract, the parties must agree on the terms of the agreement." *Tinn*, 2009 WL 507096, at *6. The parties

need not agree on all terms, but there must be agreement on those that are essential to the agreement. *Id.* (citing *Hand v. Starr–Wood Cardiac Group of Corvallis*, No. 99-1091-JO, 2001 WL 215803, at *7 (D. Or. Feb. 15, 2001)) (citing *Pacificorp v. Lakeview Power Co.*, 131 Or. App. 301, 307 (1994)). "'A term is 'material' to an enforceable agreement when it goes to the substance of the contract and, if breached, defeats the object of the parties in entering into the agreement.'" *Id.* (quoting *Johnstone v. Zimmer*, 191 Or. App. 26, 34 (2003)).

Here, the evidence submitted in support of the existence of a contract is based on Westbrook's and Bass's email communications concerning Westbrook's need for convenient billing so that Westbrook would "not have to request a PO every time [she] needed to bill" Georgia Pacific for oven use. The proffered email communications between the parties do not unequivocally establish that, when Westbrook sought to create a streamlined billing process, OPC "manifest[ed]" intent to be bound by the Terms and Conditions related to insurance and indemnity. *Ken Hood Constr. Co.*, 201 Or. App. at 578.

Further, evidence of the parties' objective conduct demonstrates that OPC did not assent to being bound to the additional Terms and Conditions listed on Georgia Pacific's website. At no point between 2012 and the oven fire of 2017—during which OPC sent 41 invoices referencing the relevant PO—did Georgia Pacific ever receive "a certificate of insurance and additional insured endorsement" or any other communication indicating that OPC had "waive[d] all rights of subrogation" that the insurers may have against Georgia Pacific. *See Bennett,* 332 Or. 138 at 153 (requiring

Page 12 – OPINION AND ORDER

evidence of "mutual assent" whether "expressed through an offer and acceptance" or "manifested by conduct.") Objectively, OPC's repeated failure to do the very thing required by the Terms and Conditions evinces OPC's outright rejection of those terms. Accordingly, Westbrook's communications with Georgia Pacific concerning the POs do not demonstrate mutual assent to the Terms and Conditions. Further, Georgia Pacific has not offered any evidence demonstrating that the parties discussed the Terms and Conditions at any point. Westbrook's statement that she preferred not to request a PO every time does not establish the existence of a contract governing Georgia Pacific's right to indemnification by OPC. The fact that the PO and invoices were exchanged for five years without OPC providing a certificate of insurance demonstrates that Westbrook reasonably understood that issuing the invoices referencing the PO was only to formalize an agreement about billing terms with Georgia Pacific.

Under the objective theory of contract formation, it is the manifestation of that assent by words and actions that is determinative. *See Glob. Exec. Mgmt. Sols., Inc. v. Int'l Bus. Machines Corp.*, 260 F. Supp.3d 1345, 1371 (D. Or. 2017) (so stating). Georgia Pacific has not met its burden to establish the essential elements of contract formation existed to prevail on its motion for partial summary judgment.[3]

---

[3] Other considerations weigh in favor of denying Georgia Pacific's Motion for Partial Summary Judgment, including that another contract between the parties existed expressly setting forth terms and conditions that did not include the insurance provisions listed out in the PO additional Terms and Conditions. Further, that Georgia Pacific could unilaterally change the Terms and Conditions at any point without notice also indicates that there was no "mutual assent" to Terms and

Page 13 – OPINION AND ORDER

Accordingly, Georgia Pacific's Motion for Partial Summary Judgment, ECF No. 28, is DENIED. OPC is entitled to summary judgment on Georgia-Pacific's contract-based claims (Claims I, II and III) and the related declaratory claim based upon provisions in the Terms and Conditions (Count IV).

## II.  Antisubrogation Rule

Subrogation is an equitable doctrine based on a theory of restitution and unjust enrichment. *Maine Bonding v. Centennial Ins. Co.*, 298 Or. 514, 520–21, 520–21 n. 4, (1985). It enables a secondarily liable party who has been compelled to pay a debt to be made whole by collecting that debt from the primarily liable party who, in good conscience, should be required to pay. *Id.* at 520–21 n. 4, 521. In the insurance context, subrogation permits an insurer in certain instances to recover what it has paid to its insured by, in effect, standing in the shoes of the insured and pursuing a claim against the wrongdoer. *Furrer v. Yew Creek Logging Co.*, 206 Or. 382, 388 (1956); *Safeco Ins. Co. v. Russell*, 170 Or.App. 636, 640 (2000), *rev. den.*, 331 Or. 674 (2001).

The subrogated party acquires precisely the same rights as the party for whom it substitutes, and no more than that. *United States F. & G. Co. v. Bramwell*, 108 Or. 261, 277–78 (1923). Thus, in the insurance context, an insurer may pursue a subrogation claim only if its insured could have pursued the underlying claim, and the insurer's claim is subject to all the defenses that could have been asserted if the

---

Conditions Georgia Pacific now seeks to enforce. However, due to the Court's resolution, it is not necessary to reach those arguments.

insured had pursued the underlying claim. *Koch v. Spann*, 193 Or. App. 608, 612 (2004). As a corollary of that general principle, an insurer has no right to subrogation against its own insured; the insured could not have pursued the underlying claim against himself or herself. *Id. at* 612. The antisubrogation rule also applies in the third-party context, where the insurer does not directly sue its insured, but a defendant in a subrogation case seeks indemnity or contribution from a third-party who is insured by the plaintiff subrogee. *See Factory Mut. Ins. Co. v. PERI Formworks Sys.*, 223 F. Supp. 3d 1133, 1137 (D. Or. 2016) (so stating).

In light of the above authority, Georgia Pacific concedes that its claims for common law indemnity (Claim VI) and contribution (Claim VII) are barred by the antisubrogation rule. ECF No. 48 at 6.

However, Georgia Pacific responds that the antisubrogation rule does not apply to its claim for negligence (Claim V), because that claim is "not purely [a] passthrough claim[.]" ECF No. 48 at 8. Georgia Pacific asserts that OPC failed to perform an "independent duty" or "caused harm independent of the harm sought to be redressed" by Hallmark's action, and therefore, its negligence claim does not "fall within the anti-subrogation rule as a matter of common sense."

To the extent that Georgia Pacific is asserting OPC's negligence as a means to claim contribution relating to Hallmark's action, the Court agrees with OPC that such a claim is barred by the anitsubrogation rule.

The Court notes that it is not clear to what extent that disposes of Georgia Pacific's negligence claim. It is possible, for example, that Georgia Pacific was not

Page 15 – OPINION AND ORDER

compensated for its lost resin, or whether Georgia Pacific stands to gain in its own right from this suit. Georgia Pacific has not illuminated this issue in its briefing. The Court's holding is therefore limited to finding that, to the extent Georgia Pacific alleges OPC was negligent and therefore liable to Georgia Pacific for any harm sought to be redressed by Hallmark, Claim V is dismissed.

## CONCLUSION

For the reasons stated above, Georgia Pacific's Motion for Partial Summary Judgment, ECF No 38, is DENIED. OPC's Motion for Summary Judgment, ECF No. 42 GRANTED.

It is so ORDERED and DATED this    2nd    day of August 2022.

/s/Ann Aiken
ANN AIKEN
United States District Judge